**HARPER v. WALL, Sheriff.**

Civ. A. No. 529.

United States District Court
D. New Jersey.

July 19, 1949.

Irving W. Rubin, New Brunswick, N. J., for petitioner.

784

Eugene T. Urbaniak, Deputy Attorney General of New Jersey, for defendant.

FORMAN, District Judge.

The petitioner, Julius Vance Harper, filed a petition for a writ of habeas corpus, alleging that he was in the custody of the Sheriff of Middlesex County at New Brunswick, New Jersey, under a warrant issued by the Governor of New Jersey, at the demand of the State of Alabama by reason of the petitioner's escape from confinement in that State.

The petition recited that his rights were violated at his trial for burglary in the State of Alabama and that after conviction and confinement in prison and in a prison camp he was subjected to cruel, barbaric and unusual punishment. It further alleged that if he is returned to complete the sentence his life will be in danger and that he will be subjected to further cruel and inhuman punishment.

Counsel was appointed for him by the Middlesex County Court of New Jersey, but that court declined to act upon a petition for a writ which was submitted to it and directed counsel to make an application to this court.

[1] This court has jurisdiction in extradition proceedings where there is an allegation of transgression against fundamental rights guaranteed by the United States Constitution. This was settled in the case of Johnson v. Dye, United States Court of Appeals for the Third Circuit, 175 F.2d 250, 257, wherein the court stated: " * * * the rule of exhaustion of state remedies does not apply where habeas corpus is sought to avoid extradition."

In compliance with the opinion in the Johnson case, the writ was allowed and on the return day the Sheriff of Middlesex County responded to it and produced the petitioner in court. Counsel, appointed as aforesaid, represented the prisoner. The court had directed that service should be made upon the Attorney General of the State of New Jersey of copies of the petition and writ with the request that he forward such copies to the Attorney General of Alabama. A Deputy Attorney General of New Jersey appeared at the time fixed for hearing and reported to the court that the Attorney General of Alabama had been notified pursuant to the court's direction, and had advised that the State of Alabama did not desire to appear at the hearing.[1]

No evidence was offered on behalf of the State of Alabama, but the Deputy Attorney General of New Jersey was permitted to cross-examine the petitioner. The petitioner testified that in November or December of 1943 he was caught in the act of committing burglary in a private residence in Mobile, Alabama, by the police of that city after he had stolen five dollars in cash. After his arrest he was taken to the police station where he was questioned for many hours concerning his implication in other burglaries. He denied that he was implicated in other burglaries and insisted that this was his first and only theft. His interrogation was carried on by as many as five members of the police force at a time. He was threatened and beaten by the police and kept incommunicado for a number of days following his arrest. He was returned to the police station and again flogged. Thereafter a paper was submitted to him

[1] The letter of the Attorney General of Alabama was read into the record. It is as follows:

"State of Alabama.
"Office of the Attorney
       General
"Montgomery 4, Alabama.
"July 6, 1949.

Dear Sir:
"I have yours of July 1 in reference to the petition for writ of habeas corpus filed by Julius Vance Harper in the United States District Court.
"I note that his hearing is set for Monday, July 11, 1949. The State of Alabama does not desire to have a representative from this State appear at the hearing. It will be very much appreciated if it is possible to have someone from the office of the Attorney General of your State appear and represent the interest of the State of Alabama. Please keep me advised in the premises.
"With kindest regards, I am
       Yours very truly,
"A. A. Carmichael, Attorney
       General
"by William N. McQueen,
"Assistant Attorney General."

which he assumes contained a confession to a series of burglaries and he was told that unless he signed it he would continue to suffer beatings. He was then 15 years of age and had stopped going to school in his birthplace in Georgia when he was in the third grade. He was unable to read and write. He testified nevertheless in order to save himself from further beatings he signed the paper without knowing its contents.

After a number of months confinement in jail he was taken before the court.[2] His alleged confession was produced and a plea of guilty was entered for him. He was without counsel and was sentenced to 10 years in prison. Thereupon he was returned to jail and from there removed to the Alabama State Prison at Montgomery. Shortly after his arrival he was flogged because he could not eat the food that was offered to him for, as he states, it was contaminated with worms. He was made aware that other men were beaten in the prison and saw them after they were returned to their cells in a beaten condition. These beatings were administered in a room allegedly kept for such purpose, known in the institution as the "dark room".

After 9 months of incarceration in the prison he was transported to the county work camp which, from the extradition papers, appears to have been located at Maplesville, Alabama. At this camp he was required to go out with the road gang and do maintenance work on the county roads. He testified that if the prisoners lagged in their work they were beaten by the guards and the warden of this camp. The food offered to the prisoners was, according to his testimony, unfit to eat. Petitioner stated that he was beaten many times and that this institution also had a "dark room" where the beatings were administered by the warden and the guards. He further testified that at one time in order to demonstrate to him what would happen if he escaped from the camp, dogs were set upon him by the warden of the institution. He ran in fear from the dogs but they caught

him and he was severely bitten about the legs before the dogs were called off. He displayed a number of scars about his legs which he stated marked the places where he had been bitten.

He also exhibited a scar on his scalp which he claimed marked the place where he had been beaten over the head. He had experienced beatings with sticks, blackjacks and straps. Although he had asked for medical attention because he felt so ill he could not work, this was denied him and he was never permitted to see a doctor.

In May of 1945 he made his escape from this camp, traveled to Tuscaloosa, Alabama, from where he continued on to St. Louis. Sometime in 1946 he enlisted in the Army and was honorably discharged therefrom as a so called "hardship case" after seven months of service, because he claimed he could obtain employment which would enable him to secure larger funds to send to his mother and other members of his family in Georgia.

He worked in laundries and hotels and finally decided to reenlist in the Army in 1948. He was accepted for such reenlistment and was serving in the Army at Camp Kilmer, Middlesex County, New Jersey in March of 1949 when the fact became known that he was a fugitive from justice in Alabama and he was then given an undesirable discharge. He was held pending the arrival of the Sheriff of Middlesex County who took him into custody on an extradition warrant outstanding against him from Alabama.

The petitioner relies upon the decision of the United States Court of Appeals for the Third Circuit in the case of Johnson v. Dye, supra. That case turned upon the fact that the petitioner therein had been subjected to cruel and unusual punishment in derogation of his rights under the federal constitution of which by force of the Fourteenth Amendment, even a state could not deprive him. The full nature of the cruel and inhuman punishment was not set out in detail in the opinion but footnote 12 states: "We shall not set out in this

2 The extradition documents refer to the Circuit Court of Mobile County, Alabama, and a sentence to 10 years in the Alabama State Prison on May 10, 1944.

opinion the revolting barbarities which Johnson and his witnesses state were habitually perpetrated as standard chain gang practice. To perpetuate these atrocities in an opinion is to be unfair to the American scene as a whole and to reflect little credit on this generation for posterity. It is enough to state that leg-irons and most frequent beatings were among the 'minor' constant cruelties."

Here the chief complaints of the petitioner were the beatings which, according to his testimony, were often administered in the Maplesville road camp. He also complained of unfit food, his injuries when dogs were purposely set upon him, and his inability to obtain medical attention.

The fact that the only testimony before the court is the story told by the petitioner, confessedly a convict and dishonest to the degree admitted by him, renders it suspect and subject to the closest scrutiny. Cf. People ex rel. Jackson v. Ruthazer, N.Y.Sup.Ct., 90 N.Y.S.2d 205. It is conceded that the brutality described by the petitioner is not of the degree which was met in the case of Johnson v. Dye, supra. But if it is to be believed, it is revolting enough.

During the cross examination of the petitioner by the Deputy Attorney General of New Jersey he was queried concerning an alleged Army charge against him as of February 1, 1948 involving him in a narcotic offense. The petitioner denied this charge but admitted that he had been absent without leave, had been tried, convicted and sentenced to Army imprisonment and loss of pay for that offense, but that was his only court martial. He also admitted that he had been questioned by the military authorities concerning possession, sale or use of marihuana while confined under the AWOL charge in 1949, but stated that he had denied any such implication and no action had been taken against him.

It was apparent that the petitioner was panting for liberty and his untutored mind and general unskillfulness contributed many inconsistencies to his testimony as well as some probable exaggeration to the discomfitures he suffered, but upon the whole he remained generally steadfast in his story.

No other testimony was offered to corroborate him.

The certificate of undesirable discharge which terminated his last service in the Army was introduced in evidence and the record contained in it tended to buttress his testimony in a number of particulars. It revealed his second enlistment as having occurred February 2, 1948 and his discharge on May 26, 1949. His length of service was listed as one year, one month and 25 days. The time difference is accounted for by the fact that there is a notation of "60 days lost under AW 107".[3] His story of earlier service in the Army and the honorable nature of his discharge therefrom is corroborated by his acceptance for reenlistment, the information on his discharge that he had previously served for seven months and that for longevity purposes the petitioner has a total of service of one year, eight months and 25 days. His date of birth was listed as June 28, 1928 which makes him 21 years of age at this time and 15 years of age when he was sentenced to the term of 10 years on May 10, 1944. The suggestion that he was involved with the Army authorities in a narcotic offense on February 1, 1948, is apparently an error according to the certificate of discharge, for he was not reenlisted until February 2, 1948.

By what has come to be recognized standards in the administration of criminal law the prisoner was a juvenile offender at the time of his sentence.[4] There appear no reasons to doubt his testimony that he had been beaten by the police to compel him to sign a paper which was used against him as a confession, that upon appearance

---

[3] Article of War 107 provides that enlisted personnel in the service of the United States must make good time lost through desertion, absence without leave, confinement under sentence of a court martial, etc. 10 U.S.C.A. § 1579.

[4] Tappen, Paul, "Children and Youth in the Criminal Court", The Annals, American Academy of Political and Social Science, Vol. 261, Philadelphia, January 1949, p. 128ff.

before the court he was not represented by counsel, found guilty, and given a ten year sentence in the state prison.

The Constitution of the State of Alabama provides: "That in all criminal prosecutions, the accused has a right to be heard by himself and counsel * * *." Article 1, § 6, Constitution of Alabama 1901. The Code of Alabama, 1940 Ed., Title 15, § 318, Laws of 1943, p. 221; Laws of 1947, p. 61, permits forma pauperis counsel only in capital cases. The courts of Alabama have construed the constitutional provision and the code to hold that no affirmative duty rests upon the courts to appoint counsel for indigents in non-capital cases. Gilchrist v. State, 234 Ala. 73, 173 So. 651; Cook v. State, 32 Ala.App. 168, 22 So.2d 924, certiorari denied 6 Div. 379, 22 So.2d 925.

Failure to appoint counsel in non-capital cases where the defendant is indigent normally is not a violation of the provisions of the United States Constitution, Gibbs v. Burke, 337 U.S. 773, 69 S.Ct. 1247; Bute v. Illinois, 333 U.S. 640, 68 S.Ct. 763, 92 L. Ed. 986; Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595. However, in Gibbs v. Burke, supra, the United States Supreme Court said that: *"Our decisions have been that where the ignorance, youth, or other incapacity of the defendant made a trial without counsel unfair, the defendant is deprived of his liberty contrary to the Fourteenth Amendment. Counsel necessary for his adequate defense would be lacking."* (Italics supplied.)

When consideration is given to the age of the petitioner at the time of his sentence, the fact that he was an illiterate youth in the State of Alabama in the custody of "a dominant group in positions of authority", Harris v. South Carolina, 69 S.Ct. 1354, 1356, 1357, and the serious nature of the penalty facing him for the crime with which he was charged, the failure to supply counsel rendered "criminal proceedings without counsel so apt to result in injustice as to be fundamentally unfair." Uveges v. Pennsylvania, 335 U.S. 437, 441,

69 S.Ct. 184, 186. Cf. Wade v. Mayo, 334 U.S. 672, 684, 68 S.Ct. 1270, 92 L.Ed. 1647; De Meerleer v. Michigan, 329 U.S. 663, 67 S.Ct. 596, 91 L.Ed. 584; Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527.

No contradiction is offered against the assertions of the petitioner herein. The authorities of Alabama did not choose to refute his statements although opportunity was afforded them to do so. The inconsistencies in his testimony do not destroy the credible nature of the chief and important portions of it. Although his testimony lacked corroboration in many instances, it carried conviction when fitted into the pattern of the realities as they are known. It is evident beyond reasonable doubt that the alleged police procedure, the beatings prior to obtaining the confession, the lack of representation by counsel, the county camp labor system, the indignities accorded colored men in the State of Alabama, are conditions to which this colored youth of 15 years was exposed to his irreparable injury. In their composite they spell out cruel and unusual punishment within the scope of Johnson v. Dye, supra, and demonstrate a violation of his rights protected by the Fourteenth Amendment of the United States Constitution.

Recently this court dealt with a similar application for a writ of habeas corpus made by an escapee from Georgia. In the Matter of the Application of James Marshall for a Writ of habeas corpus, In re Marshall, D. C., 85 F.Supp. 771. The writ there was discharged and the petitioner remanded. However, that case is distinguishable in that there the petitioner was an adult several times convicted of crime and the Georgia authorities appeared at the hearing, vigorously contested certain of the allegations and offered testimony to show that the perpetrators of the cruelties charged by the petitioner had been tried, convicted and were no longer in the employ of the authorities.

An order will be signed discharging the petitioner from custody.